

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 9, 2018

BY CM/ECF AND HAND

The Honorable Loretta A. Preska
Senior United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

      Re:    United States v. Gary Tanner and Andrew Davenport,
               S1 17 Cr. 61 (LAP)

Dear Judge Preska:

      The Government writes in response to the Court's January 2, 2018 Order directing the parties to "inform the Court . . . of their views as to the applicability of *United States* v. *Brown*, 459 F.3d 509 (2006) to this case." (Jan. 2, 2018 Order (Dkt. 79)). For the reasons below, the Government respectfully submits that that case is not applicable here. *Brown* is no longer good law in light of the Supreme Court's decision in *Skilling* v. *United States*, 561 U.S. 358 (2010); it is distinguishable from this case; and, even if it was not, the Superseding Indictment specifically alleges that Tanner's actions were contrary to Valeant's interests. The defendants' motion to dismiss should accordingly be denied in its entirety.

## BACKGROUND

      In *United States* v. *Brown*, the Government charged several individuals at Enron and Merrill Lynch with honest services fraud and other offenses for taking part in a conspiracy to manipulate Enron's end-of-year earnings. 459 F.3d at 513. Specifically, the defendants arranged for three Nigerian barges in which Enron had an interest to be in effect "sold" to Merrill Lynch, thereby allowing Enron to recognize revenue from the sale. *Id.* The Enron defendants, however, orally agreed to buy the barges back after six months at a set rate of return, and, despite recognizing in faxes that this would be "aid[ing]/abet[ting] Enron income stmt. manipulation" and "income manipulation," the Merrill Lynch defendants agreed. *Id.* (internal quotation marks omitted). *Id.* The consequence of this oral agreement was "that Enron's accounting of the deal as a sale rather than a lease was false," and Enron's year-end earnings were artificially increased as a result. *Id.* Five of six defendants were convicted after trial. *Id.* at 517.

      At trial, the Government argued that this securities fraud was also a violation of the honest services fraud statute because there was "a fiduciary breach—the failure to disclose the full truth about the barge transaction—that resulted in both a personal benefit (increased bonus)

to the duty-breaching Enron employees and detriments (but also benefits) to the corporation itself." *Id.* at 520. Notably, the honest services charge rested entirely on the employees' breach of fiduciary duty; the Government never alleged any type of bribery or kickback scheme.

On appeal, the defendants argued that the Government's theory was insufficient to show a criminal deprivation of honest services, and the Fifth Circuit agreed. *Id.* at 517. The Court held that "in typical bribery and self-dealing cases, there is usually no question that the defendant understood the benefit to him resulting from his misconduct to be at odds with the employer's expectations." *Id.* at 522. Bribes, kickbacks, and self-dealing, after all, all result in some payment that accrues to the employee by virtue of the misuse of his position. But the "exceptional" facts before the court "present[ed] a situation in which the dishonest conduct [was] disassociated from bribery or self-dealing." *Id.* The Court explained:

> Given that the only personal benefit or incentive originated with Enron itself—not from a third party as in the case of bribery or kickbacks, nor from one's own business affairs outside the fiduciary relationship as in the case of self-dealing— Enron's legitimate interests were not so clearly distinguishable from the corporate goals communicated to the Defendants (via their compensation incentives) that the Defendants should have recognized, based on the nature of our past case law, that the "employee services" taken to achieve those corporate goals constituted a criminal breach of duty to Enron.

*Id.* Critically, the Court recognized that Enron's senior executive management, and in particular its Chief Financial Officer, were aware of the illegality of the particular transaction at issue but nonetheless "support[ed]" it. *Id.* at 522 n.13. Under these circumstances, where senior level management had expressly sanctioned the conduct at issue by the trial defendants, the Court found it improper to hold a lower-level employee liable for violating the honest services fraud statute. *See id.*

## DISCUSSION

*Brown* does not have any applicability to this case for three reasons. First, *Brown* and its progeny are simply no longer good law. *Brown* dealt with the application of honest services fraud *when no bribe or kickback was alleged*. The Supreme Court's decision in *Skilling*, which did away with any honest services cases not involving bribes or kickbacks, accordingly overruled *Brown* and made it irrelevant. Second, and relatedly, even if *Brown* remained viable law, it is legally and factually distinguishable from this case. Most centrally, this case involves bribes and kickbacks. *Brown* does not. The court in *Brown* specifically distinguished the facts in that case from cases involving bribery and kickback schemes, noting that "there is usually no question that the defendant understood the benefit to him resulting from his misconduct to be at odds with the employer's expectations" in such cases. 459 F.3d at 522. Additionally, even in the now-extinct subset of cases to which *Brown* applied (cases not involving bribes or kickbacks), subsequent Fifth Circuit cases limited *Brown* to situations in which there was explicit managerial approval of illegal conduct—which, again, is not true in this case since Tanner did not engage in illegal conduct at the behest of Valeant. Third, even if this Court were to find *Brown* to remain viable law and to apply to this case, it would make no difference to the pending motion to dismiss since

the Superseding Indictment specifically alleges, in stark contrast to the facts in *Brown*, that Tanner took actions that were contrary to Valeant's interests in exchange for an illegal kickback from Davenport.

I.   *Brown* Is No Longer Good Law in Light of *Skilling*

As an initial matter, *Brown* involved (at best) self-dealing by an employee as opposed to a bribery or kickback scheme, and, as a result, relates to conduct no longer deemed criminal under the honest services fraud statute.  *See Skilling*, 561 U.S. at 368 (holding that a bribe or kickback is required).  Put differently, *Brown* addressed what the Government must prove to establish honest services fraud when there was no kickback or bribe.  Other pre-*Skilling* cases, including cases in this Circuit, grappled with the same question.  *See, e.g., United States* v. *Rybicki*, 354 F.3d 124, 141 (2d Cir. 2003) ("In bribery or kickback cases, the undisclosed bribery itself is sufficient to make out the crime, *but in self-dealing cases*, the existence of a conflict of interest alone is not sufficient to do so.") (emphasis added); *id.* ("*In the self-dealing context*, though *not* in the bribery context, the defendant's behavior must thus cause, or at least be capable of causing, some detriment—perhaps some economic or pecuniary detriment—to the employer.") (emphasis added).  *Skilling* put an end to this entire line of cases by simply stating that you cannot have honest services fraud without an allegation of a bribe or kickback.

This overall distinction is critical to the additional points set forth below.  The *Brown* court articulated factors and limits to the honest service fraud theory in cases *where no bribe or kickback was alleged*.  Those factors and limitations, however, were never related to, or imposed in, cases in which bribes or kickbacks in fact were alleged.  Given this background, it should come as no surprise that *Brown*'s discussion of corporate goals absent a bribe or kickback does not appear to have been cited by any court since *Skilling* limited the application of the honest services fraud statute.  This makes perfect sense, as there are no longer any honest services cases absent a bribe or kickback.  *Brown* simply articulated the contours for a type of honest services fraud case that no longer exists post-*Skilling*.

II.   *Brown* Is Distinguishable from this Case

Setting aside the fact that it was overruled by *Skilling*, the Fifth Circuit's decision in *Brown* is distinguishable from this case because *Brown* did not involve a bribery or kickback scheme.  This case does.  Also unlike this case, *Brown* addressed a scenario where there was explicit managerial approval of the misconduct.  Here, there was not.

A. *Brown*'s Discussion of Corporate Goals Does Not Apply to Bribery and Kickback Cases

To begin, Brown is distinguishable from this case for the straightforward reason that it did not involve an allegation of a bribe or a kickback.  It instead involved only a breach of a state-law fiduciary duty by several Enron employees.  *See* 459 F.3d at 522 (noting that the alleged benefit received by the employees "originated with Enron itself—not from a third party as in the case of bribery or kickbacks, nor from one's own business affairs outside the fiduciary relationship as in the case of self-dealing"); *id.* (noting that the "the dishonest conduct [was]

disassociated from bribery or self-dealing"); *id.* (differentiating case form the "typical bribery and self-dealing cases" where "there is usually no question that the defendant understood the benefit to him resulting from his misconduct to be at odds with the employer's expectations"). Notably, the court found that the case was "exceptional" in part for this reason. *Id.*

The absence of a bribe or kickback was critical to the Fifth Circuit's reasoning in two respects. First, while the Fifth Circuit focused on the alignment of the employee and employer's interests, it recognized that there is *necessarily* a disunity of interests when an employee receives a kickback or bribe. As the Court explained, "in typical bribery and self-dealing cases, there is usually no question that the defendant understood the benefit to him resulting from his misconduct to be at odds with the employer's expectations." *Id.* at 522. Employers, after all, expect that their employees will not accept bribes and kickbacks.[1]

Second, the Court reasoned that the Government's theory of liability would have been unworkable. Given the absence of a bribe or kickback, the Government's theory in *Brown* might have turned every breach of a state-law fiduciary duty by an employee into a violation of the honest services fraud statute. *See id.* at 522 n.13 (the Government's theory "would expand honest-services fraud to reach all manner of accounting fraud and securities fraud, which have not generally been prosecuted as honest-services fraud and are heavily regulated under other statutes"); *see also id.* at 522 ("But that view encompasses every knowing fiduciary breach, and we meet again our oft-mentioned chariness of making every knowing fiduciary breach a federal crime."). This concern, however, does not apply where there are bribery or kickback schemes, which, as the Supreme Court explained in *Skilling*, are at the heartland of what the honest services fraud statute prohibits. *See, e.g.*, 561 U.S. at 412 (explaining that "whatever the school of thought concerning the scope and meaning of § 1346, it has always been as plain as a pikestaff that bribes and kickbacks constitute honest services fraud . . . and the statute's *mens rea* requirement further blunts any notice concern" (quotation and citation omitted)).

B. **Even Prior to *Skilling* Eliminating Non-Bribe or Kickback Honest Services Cases, *Brown* Was Limited to Cases With Express Senior-Level Approval of an Illegal Act by an Employee**

Leaving aside that there is an allegation of a bribe or kickback in this case, *Brown* is again distinguishable for the additional reason that senior level management expressly endorsed the particular accounting fraud in that case. As the court explained, there was "senior executive support" for the parking scheme at issue, which was expressly "sanctioned" by Enron's Chief Financial Officer. *Id.* at 522 n.13. This "created an understanding that Enron had a corporate interest in, and was a willing beneficiary of, the scheme." *Id.* The senior-level approval of the

---

[1] For this reason, courts have routinely affirmed honest services fraud convictions where an employee, for example, awards a contract to another party in exchange for a bribe or kickback without regard to whether the contract was desirable from the employer's perspective. *See, e.g.*, *United States* v. *Richman*, 944 F.2d 323, 330 (7th Cir. 1991); *United States* v. *Fagan*, 821 F.2d 1002, 1009 (5th Cir. 1987); *United States* v. *Shyres*, 898 F.2d 647, 653 (8th Cir. 1990); *United States* v. *Little*, 889 F.2d 1367, 1368 (5th Cir. 1989); *Ranke* v. *United States*, 873 F.2d 1033, 1040 (7th Cir. 1989); *United States* v. *George*, 477 F.2d 508, 513 (7th Cir. 1973).

Case 1:17-cr-00061-LAP   Document 80   Filed 01/09/18   Page 5 of 6

Page 5

charged conduct, the court reasoned, distinguished the case from *United States* v. *Gray*, 96 F.3d 769 (5th Cir. 1996), in which the Fifth Circuit had affirmed an honest services fraud conviction of several college basketball coaches who helped fraudulently establish the academic eligibility of transfer students that they wanted to play on their teams. *Brown*, 459 F.3d at 522 n.13. The Court in *Brown* reasoned that the facts before it were different than those in *Gray* because "[t]he opinion in *Gray* presents only the coaches' own belief that their scheme benefitted the university; no one or any authority outside the cadre of coaches encouraged, approved, or even knew of the wrongdoing." *Id.*

Cases decided after *Brown* but before the Supreme Court's decision in *Skilling*, moreover, have reaffirmed *Gray*'s contrary ruling and emphasized the importance of the misconduct in *Brown* having been specifically sanctioned by management—and clarified that *Brown* applied only in such instances. In *United States* v. *Skilling*, 554 F.3d 529 (5th Cir. 2009), the precursor to the Supreme Court's decision, Enron's CEO Jeffrey Skilling was charged under the honest services fraud statute for having overstated Enron's financials. Like *Brown*, there was no *quid pro quo* bribery or kickback scheme. *See id.* at 546. And given the similarity in the allegations, Skilling unsurprisingly attempted to "latch[] onto [the court's] discussion in *Brown* regarding corporate interest and contend[] that his actions were not fraudulent because he acted in pursuit of Enron's goals of achieving a higher stock price." *Id.* Notably, this argument is no different than the one Tanner and Davenport now make.

The Fifth Circuit, however, flatly rejected this argument. It distinguished *Brown* and stated that the involvement of senior management in that case was "crucial." *Id.* at 545. "[W]e can distill the holding in *Brown*," the Court reasoned, "to be the following: when an employer (1) creates a particular goal, (2) aligns the employees' interests with the employer's interest in achieving that goal, and (3) has higher-level management *sanction improper conduct to reach the goal*, then lower-level employees following their boss's direction are not liable for honest-services fraud." *Id.* (emphasis in original). Thus, even acting in an employer's interests was not enough to enjoy the limitations on honest services fraud prosecutions set forth in *Brown*. As the Court reasoned, "[i]f this were the correct reading of *Brown*, that decision would be in irreconcilable conflict with *Gray*, which binds us, as the basketball coaches in *Gray* acted pursuant to their employer's interest of having a winning basketball team." *Id.* at 545-46. Applying this reasoning to the facts before it, the Fifth Circuit affirmed Skilling's conviction because "no one at Enron sanctioned Skilling's improper conduct. That is, Skilling does not allege that the Board of Directors or any other decisionmaker specifically directed the improper means that he undertook to achieve his goals." *Id.* at 546.

The same distinction applies here. Regardless of whether Tanner and Davenport had a "belief that their scheme benefitted [Valeant]," *Brown*, 459 F.3d at 522 n.13, no one at Valeant knew that Tanner had agreed to accept a kickback, let alone that he had agreed to advise Davenport secretly on deal terms, that he had surreptitiously refused to diversify Valeant's business to other pharmacies so as to make Valeant more reliant on Philidor, or that he had negotiated worse payment and credit terms for Valeant.

It is important to reiterate, however, that the entire *Brown*-premised analysis relating to alignment with employer interest applied only to cases that, like *Brown* and *Skilling*, did not

involve bribes or kickbacks.  When, by virtue of *Skilling*, this sub-category of cases died, the relevance of these *Brown*-related factors died with it.

### III. The Indictment in this Case Alleges that Tanner Took Actions Contrary to Valeant's Interests

Finally, even if the Court were to conclude that *Brown* was still good law and applies to this case, it would not support the defendants' motion to dismiss.  The Superseding Indictment identifies four sets of actions that Tanner took in exchange for a kickback from Davenport and specifically alleges that each was "contrary to Valeant's interests."  Superseding Indictment ¶ 9; *see also* Dec. 8, 2017 Ltr. at 12-16 (Dkt. 75) (discussing allegations in Superseding Indictment). The idea that Valeant—by allegedly instructing Tanner to grow Philidor in some unspecified fashion—would have wanted him to refuse instructions to enter into relationships with other pharmacies and negotiate worse terms for Valeant is illogical.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

by: /s/ Robert Allen
Robert Allen
Amanda Kramer
Richard Cooper
Assistant United States Attorneys
(212) 637-2216/2478/1027